**In re Nelson Grant HALLAHAN d/b/a Nelson Hallahan & Associates, Debtor.**

**N.I.S. CORPORATION and Ozark National Life Insurance Company, Plaintiffs,**

**v.**

**Nelson Grant HALLAHAN, Defendant.**

**Bankruptcy No. 185–00458.
Adv. No. 185–0148.**

United States Bankruptcy Court, C.D. Illinois.

Oct. 16, 1987.

Mark G. Zellmer, Husch, Eppenberger, Donohue Elson & Cornfeld, St. Louis, Mo., Bret Babcock, Peoria, Ill., for plaintiffs.

Gary Rafool, Nile J. Williamson, Peoria, Ill., for defendant.

## OPINION AND ORDER

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

N.I.S. Corporation and Ozark National Life Insurance Company (OZARK) brought this adversary proceeding to determine the dischargeability of a debt under Section 523(a)(6). N.I.S. contends that the debt arises from willful and malicious injury by the defendant, Nelson Grant Hallahan. Presently before the Court are cross motions for summary judgment, as well as N.I.S.'s motion to strike defendant's Exhibit, defendant's motion to strike plaintiffs' affidavit and defendant's demand for a jury trial.

The defendant, Nelson Grant Hallahan, began selling insurance policies for OZARK in 1977. In the spring of 1982, N.I.S. was formed to purchase OZARK and Hallahan became a manager for N.I.S. The Agency Contract which he signed contained a covenant not to compete, which provides:

"COVENANT NOT TO COMPETE

If this Contract is terminated by either party for any reason, Agent agrees that he will not, for a period of four (4) years from the date of termination, within the county or counties in which Company is located or doing business at the time of termination or within the immediate adjoining counties:

(i) Directly or indirectly, for himself or on behalf of any other person or firm, engage in or become interested in, affiliated or connected with, any activity or business that competes with the business of Company, directly or indirectly, in any manner; and

(ii) Directly or indirectly, for himself or on behalf of any other person or firm, induce or attempt to induce any officer, employee, agent or agents of Company,

its subsidiaries or affiliates to resign or sever his or its employment relationship with the Company, its subsidiaries or affiliates; or

(iii) Directly or indirectly, for himself or on behalf of any other person or firm, induce or attempt to induce any policyholder of any Insurance Company to cancel, surrender, apply for a policy loan under or to discontinue the payments of premiums on any policy issued by such Insurance Company." [1]

The contract also provided that it would be governed by Missouri Law.

As of December 5, 1983, N.I.S. removed Hallahan from his management position and terminated his contract. Thereafter, Hallahan began selling insurance for Connecticut Mutual. By agreement, a preliminary injunction was issued by a federal district court in Kansas City in 1984 to enjoin Hallahan from selling Connecticut Mutual policies or any other policies to OZARK policy holders.

Hallahan filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on June 3, 1985. N.I.S. brought this complaint contending that Hallahan's actions in selling Connecticut Mutual insurance to OZARK policy holders constitutes an intentional interference with N.I.S.'s business expectancies and a willful breach of the covenant not to compete.

Hallahan filed a motion for summary judgment or, in the alternative, judgment on the pleadings. Attached to his motion is an investigation report in summary form, listing various former OZARK policy holders and describing their contacts with Hallahan. Accompanying the report is an affidavit of Hallahan which states that none of the persons listed on the investigation re-

port were referred by N.I.S. and that during his employment with both OZARK and N.I.S., he was never given any referrals of possible customers by either OZARK or N.I.S. N.I.S. moved to strike the investigation report attached to Hallahan's motion for summary judgment.

N.I.S. also moved for summary judgment on the issue of Hallahan's liability, not requesting this Court to issue an injunction or to determine the amount of damages. Among the numerous exhibits attached to N.I.S.'s motion for summary judgment were the affidavits of Gerald J. Kohout, President of OZARK, Richard G. Luelf, an agent and zone manager for OZARK and N.I.S., and Charles Sharpe, Jr., the President of N.I.S. and Chairman of the Board of OZARK. In his affidavit, Sharpe testifies as to the formation of N.I.S. and lists the percentage of lapsed policies for both Hallahan and for OZARK as a whole. Sharpe also states that, based on his experience with the company, it takes approximately four years for an insurance agent to establish a continuing relationship with a client. Hallahan moved to strike the affidavit of Charles Sharpe on the grounds that it contained conclusory allegations and was duplicative of depositions which had previously been filed in the case.[2]

A hearing on all motions was held on January 12, 1987, and the matters were taken under advisement. At the hearing, Hallahan admitted that he had sold Connecticut Mutual policies to many former OZARK policy holders who dropped their OZARK policies at that time.

 Hallahan moves this Court to strike the affidavit of Charles Sharpe, Jr., President of N.I.S. and Chairman of the Board of OZARK, on the ground that it is conclu-

---

1. Although the Covenant Not To Compete provides that Hallahan shall not engage in a business which competes with N.I.S., at the time of Hallahan's termination, N.I.S. was not seeking to enforce this provision as long as Hallahan otherwise complied with the terms of the Covenant Not To Compete.

2. Hallahan's motion to strike erroneously refers to an affidavit of Daniel Flanigan. Although Flanigan's deposition is included as an exhibit to N.I.S.'s motion for summary judgment, no

affidavit is referred to in N.I.S.'s motion nor does one appear in the court file. Nor is Sharpe's deposition a part of the court file. Hallahan also objected to the affidavits as not having been made upon the personal knowledge of the affiants. This defect was cured by the filing of supplemental affidavits by Sharpe and Kohout which stated that the information contained therein was based on the affiants' personal knowledge. *Liberty Curtin Concerned Parents v. Keystone Cent.*, 81 F.R.D. 590 (D.C.Pa.1978).

sory and self-serving. Although an affidavit which contains only unsupported allegations which are conclusory in nature must be stricken on motion of the opposing party, where the affiant is competent to testify as to the matters stated therein and the allegations are based upon personal knowledge of the affiant, the affidavit meets the requirements of Rule 56(e) of the Federal Rules of Civil Procedure, which governs the form of evidence to be submitted on a motion for summary judgment. The affidavit, as supplemented, shows that it was made on the affiant's personal knowledge and that the affiant is competent to testify as to the matters stated therein. The affidavit shows that the company official was testifying about company statistics which were within his personal knowledge. His testimony and the facts contained in the affidavit would be admissible at trial. Hallahan's motion to strike the affidavits is accordingly denied.

■ N.I.S. contends that the investigation report attached to Hallahan's motion for summary judgment should be stricken.[3] That report was originally solicited by N.I.S. and later produced to Hallahan in discovery proceedings. In *Western Min. Corp., Ltd. v. Standard Terminals*, 577 F.Supp. 847 (D.C.Pa.1984), *aff'd* 745 F.2d 49 (3d Cir.1984), the court struck the affidavit of a private investigator which was primarily based on his conversations with other persons, ruling that the information contained in the affidavit was hearsay and would not be admissible at trial. For that same reason, N.I.S.'s motion to strike the investigation report is well-founded and will be allowed.

Both N.I.S. and Hallahan have moved for summary judgment. Summary judgment is appropriate only if the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Goodrich v. Intern. Broth. of Elec. Workers, AFL–CIO*, 712 F.2d 1488 (C.A.D.C. 1983). The court must view the evidence in the light most favorable to the party opposing the motion. *International Administrators v. Life Ins. Co.*, 753 F.2d 1373 (7th Cir.1985). On cross motions for summary judgment, the court must rule on each party's motion on an individual basis and both motions should be denied if genuine fact issues exist. *Wausau Ins. Co. v. Valspar Corp.*, 594 F.Supp. 269 (N.D.Ill.1984).

■ Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *In re Simpson*, 29 B.R. 202 (Bkrtcy.1983). A creditor asserting nondischargeability must prove its claim by clear and convincing evidence. *In re Bothwell*, 32 B.R. 617 (Bkrtcy.1983). N.I.S.'s complaint for nondischargeability is based on Section 523(a)(6). That section provides that an individual is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. Section 523(a)(6). To except a debt from discharge on the ground of willful and malicious injury, the creditor must prove (1) a willful and malicious act (2) done without cause (3) which leads to harm. The word "willful" in this context means "deliberate or intentional" and this Court has previously held that a malicious injury means an act by the debtor done with knowing disregard for the rights of another, rejecting the view that the creditor must show that the debtor acted with ill will or malevolent purpose toward the injured party.

In the present case, there is no question that Hallahan's sales of Connecticut Mutual policies to OZARK policy holders were willful. Furthermore, Hallahan has offered no justification or excuse for his actions. The only issue to be determined is whether Hallahan's sales of Connecticut Mutual policies to OZARK policy holders was malicious. More specifically, the issue is whether the covenant not to compete is valid. For if the covenant not to compete is invalid as Hallahan contends, his actions in selling the Connecticut Mutual policies to OZARK policy holders could not be con-

---

**3.** As this Court previously noted, the investigation report is in summary form. It is unsigned and unsworn and is not a proper affidavit for summary judgment purposes.

sidered malicious as they would not have been in derogation of N.I.S.'s rights.

◼ Historically, Missouri courts have upheld agreements not to compete where reasonably restricted in time and in space. *Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71 (Mo. banc, 1985). Discussing Missouri case law, the court in *Sigma Chemical Co. v. Harris,* 605 F.Supp. 1253, 1260 (E.D.Mo. 1985), *rev'd on other grounds,* 794 F.2d 371 (8th Cir.1986), stated:

> "The benchmark in determining the validity of a restrictive covenant is whether it is reasonable. *Orchard Container Corp. v. Orchard,* 601 S.W.2d 299, 303 (Mo.Ct.App.1980). 'Missouri law recognizes that a temporally and spatially limited restraint on an employee's ability to compete with his former employer will be enforced in equity if reasonable under all of the attending circumstances and if enforcement serves the employer's legitimate protectible interest.' *Mo–Kan Central Recovery Co. v. Hedenkamp,* 671 S.W.2d 396, 399 (Mo.Ct.App.1984). Thus, reasonableness has three (3) components: (1) the covenant must be reasonably necessary to protect the employer's legitimate interest; (2) the covenant must be reasonable in terms of temporal scope; and (3) the covenant must be reasonable in terms of geographic scope. *Orchard, 601 S.W.2d at 303.*"

Customer contacts constitute a legitimate employer interest entitled to protection. *See Osage Glass, supra.*

Hallahan contends that the covenant not to compete is unreasonable both as to the time element and as to the territorial limitation. Relying on *Fred A.H. Garlich's Agency Co. v. Anderson,* 226 S.W. 978 (Mo.App.1920) N.I.S. contends that the four-year period of the covenant not to compete is reasonable. It is important to note here that N.I.S. was not attempting to prevent Hallahan from selling insurance for a competing company. Rather, N.I.S. sought only to restrict Hallahan from inducing insureds under OZARK policies to cancel or fail to renew those policies. Such a restriction is in the nature of what has been termed a "hands-off" agreement and is far less restrictive than a typical covenant not to compete. That factor is equally relevant to Hallahan's contention that the failure of the covenant to provide for any geographical limitation renders it *per se* unreasonable. With the exclusion of OZARK policyholders, Hallahan may sell insurance anywhere he so desires. This Court finds that the covenant not to compete is reasonable.

Hallahan also maintains that the covenant not to compete violates the Sherman Act. The Sherman Act makes illegal:

> "Every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations...."

Covenants not to compete contained in employment contracts are not *per se* violative of the Sherman Act, but must be analyzed under the rule of reason. *Consultants & Designers v. Butler Service Group,* 720 F.2d 1553 (11th Cir.1983). For the reasons previously stated, this Court finds that the post-employment restraints contained in the Agency Contract are reasonable.[4]

---

**4.** The court in *USA Chem, Inc. v. Lewis,* 557 S.W.2d 15 (Mo.App.1977), discussed the development of the rule:

> "Being in restraint of trade, [covenants not to compete] were first regarded as contrary to public policy and hence invalid. 'The reason for such rule was two-fold, * * * injury to the public and injury to the employee. The restraint worked injury to the public by depriving it of the industry to which the employee was best suited, and tended to cast the employee and his family upon the public for support. It also fostered monopolies, prevented competition, and tended to raise prices. * * * The doctrine had its origin at a time when the field of human enterprise was limit-

ed, and each man's industrial activity was necessary to the material welfare of his community. Travel was difficult, and the conditions of the times were unfavorable to the migration of persons seeking employment. * * * [W]ith the improved facilities for travel, and the growing ability of workers to adapt themselves to different occupations, the reason for the rule disappeared, with the result that the courts began to uphold reasonable restraints on employment on the theory that such covenants were beneficial to * * * the employee for the reason that it enabled him to dispose of his services advantageously, and * * * to the employer because it protected him against a competition which would not

Lastly, Hallahan contends that the agency contract which he entered into with N.I.S. was a contract of adhesion and is unenforceable. The Court of Appeals of Missouri recently rejected a similar contention in *Adrian N. Baker & Co. v. DeMartino,* 733 S.W.2d 14 (1987), stating:

"Appellant contends the parties were not of equal bargaining power and that he was presented with 'what amounted to a contract of adhesion.' All three principals of respondent testified appellant was told at the time of the negotiations he would be required to sign a covenant not to compete. Although the agreement was not officially signed until December, appellant was made aware prior to beginning employment what the conditions of his employment would be. Appellant also ultimately received a commission percentage of forty-five percent; ten percent more than the principals were receiving. If the conditions were unsatisfactory appellant could have sought employment elsewhere. Our review of the record does not disclose any circumstances surrounding the signing of the employment agreement that would render its enforcement inequitable."

*See also USA Chem, Inc. v. Lewis, supra.*

This Court takes a similar view in the present case. In his deposition, Daniel J. Flanigan, counsel for N.I.S., stated that before the OZARK agents entered into the agency contracts with N.I.S., he specifically reviewed the provisions of the covenant not to compete with them. According to the agency contract, the insurance agent would receive 56% of the first year commissions on premiums paid; 5% on renewal commissions on premiums paid during the 2nd through 10th years; and 1½ percent of renewal commissions thereafter. Hallahan's contention that the contract was without benefit to him is simply untrue.

■ In sum, this Court determines that the covenant not to compete is valid and enforceable. And while it is true that as a general principle questions of intent are not appropriate for summary disposition, merely because the creditor has asserted a cause of action to which state of mind is an element does not defeat a motion for summary judgment. *In re Weiss–Wolf, Inc.,* 60 B.R. 969 (Bkrtcy.S.D.N.Y.1986). In this case, it is admitted that Hallahan breached the covenant not to compete. He intentionally and knowingly sold Connecticut Mutual insurance policies to OZARK policy holders, in violation of the covenant. Hallahan has failed to offer any just cause or excuse. It is clear that his actions were both willful and malicious. N.I.S. is entitled to summary judgment on the issue of liability. However, N.I.S. must prove that it suffered injury as a result of Hallahan's actions. It will not be sufficient to show that the percentage of lapsed policies of OZARK policyholders which Hallahan had contacted, sold, serviced and otherwise dealt with significantly exceeded the percentage of lapsed policies for the company as a whole. N.I.S. must show that, but for Hallahan's contacts with the OZARK policyholders, the policies would not have lapsed.

■ There are two other matters which must be addressed by this Court. At oral argument, N.I.S. devoted considerable attention to whether Hallahan had committed the tort of intentional interference with business expectancies. Presumably, N.I.S.'s position is that a determination by this Court that Hallahan had committed such a tort would *ipso facto* result in a finding of nondischargeability. This Court does not agree. The question of whether a debt is dischargeable in bankruptcy is one of federal law and the bankruptcy court must make its own determination. N.I.S.

otherwise have existed except for the employment. * * * Also important * * * was * * * requiring persons who, by the solemnity of contract, had assumed certain engagements, to observe them. * * * [R]easonableness of the restraint was to be determined according to the particular facts of each case, taking into consideration the subject matter, the situation of the parties, the nature of the business re-

strained, and the extent of the restraint with reference to time and space. * * * [I]t has been generally held that the restraint must be qualified as to time and space, and not greater than is required for the protection of the person for whose benefit it is imposed'." *Renwood Food Products v. Schaefer,* 240 Mo.App. 939, 223 S.W.2d 144, 150–151 (1949).

brought this complaint under Section 523(a)(6) and the elements which it had to prove are those which were previously set forth. Finally, because there is no right to a jury trial in the bankruptcy court in a dischargeability action, Hallahan's demand for a jury trial is denied. *In re Lee*, 50 B.R. 683 (Bkrtcy.1985).

For the foregoing reasons, IT IS ORDERED that:

1. Hallahan's motion to strike the affidavits of Gerald J. Kohout and Charles Sharpe, Jr. is DENIED.

2. N.I.S.'s motion to strike the investigative report attached to Hallahan's motion for summary judgment is GRANTED.

3. The motion of N.I.S. for partial summary judgment is hereby GRANTED.

4. The motion of Hallahan for summary judgment is hereby DENIED.

5. Hallahan's demand for a jury trial is hereby STRICKEN.

6. The issue of damages suffered by N.I.S. as a result of Hallahan's willful and malicious conduct will be set for hearing.