In re John M. LESLIE, Debtor.

Charlotte LESLIE, Plaintiff,

v.

John M. LESLIE, et al., Defendants.

Bankruptcy No. 94–31710.
Adv. No. 94–3147.

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

April 26, 1995.

318

Charles D. Cobau, Perrysburg, OH, for plaintiff.

Sharon S. Speyer, Toledo, OH, for Mid American Nat. Bank & Trust Co.

Vesper C. Williams II, Toledo, OH, for John Leslie.

## OPINION AND ORDER EXCEPTING DEBTS FROM DISCHARGE

WALTER J. KRASNIEWSKI,
Bankruptcy Judge.

This matter is before the Court upon the adversary complaint (the "Complaint") filed by Charlotte Leslie ("Charlotte") to except certain of the debts of John M. Leslie ("Debtor") from discharge under 11 U.S.C. § 523(a). The Court finds that the Complaint is well taken and that the Debtor's debts owed to Charlotte should be excepted from discharge.

### FACTS

The Debtor filed a petition under chapter 7 of title 11 on July 15, 1994.

Charlotte, the Debtor's former wife, seeks to except from discharge certain obligations which arose in connection with a judgment entry of divorce entered in September of 1989 (the "Decree"). See Plaintiff's Exhibit 4, Judgment Entry of Divorce.

Charlotte married the Debtor in December of 1962. Charlotte and the Debtor had 5 children during their marriage. The Debtor was self-employed as a dentist throughout the course of the marriage.

On the date of the Decree, Charlotte resided with the Debtor's son Ted in the former marital residence at 5515 Woodridge (the "Home"). Ted was 17 years old on the date of the Decree.

The Debtor was self-employed as a dentist and his net business income approximated $48,576.00 per year at the time of the divorce. See Plaintiff's Exhibit 3, 1987 Federal Income Tax Return.

At the time of the Decree, Charlotte was employed as a teacher with the Sylvania City Schools and earned an income of approximately $20,870.00 per year. Charlotte testified that her total monthly living expenses were approximately the same as her income at the time of the divorce. See Plaintiff's Exhibit 6. Charlotte further testified that the parties contemplated that the Debtor would repay, and hold Charlotte harmless as to, certain of the debts of his dental practice as set forth in the Decree. Charlotte testified that she would have required additional support payments from the Debtor at the time of the divorce if she had been required to repay the debts assumed by the Debtor in the Decree.

## The Credit Line

The Home was encumbered by an open-end second mortgage in favor of Mid–American Bank (the "Open-end Mortgage") at the time of the Decree. *See* Plaintiff's Exhibit 2, dated October, 1986. The Open-end Mortgage secured a line of credit which the Debtor and Charlotte obtained from Mid–American Bank (the "Bank") on November 5, 1986 (the "Credit Line"). *See* Plaintiff's Exhibit 1, Revolving Cognovit Note. The Debtor and Charlotte obtained the Credit Line in order to provide the Debtor with a source of cash flow for his dental practice. Charlotte testified that, since the Credit Line was viewed by the parties as a business loan for the Debtor, she did not receive a copy of the documents evidencing the Credit Line and the Open-end Mortgage until a number of years after the divorce.

The Decree ordered the Debtor to pay, and to hold Charlotte harmless as to, the Credit Line which had a $4,800.00 balance. *See* Decree at p. 8, para. 1 ("[Debtor] shall assume the obligations to MasterCard, First National Bank, Mid–Am Bank, and Society Bank, and hold [Charlotte] harmless thereon"). In accordance with the Decree, the Debtor quitclaimed his interest in the Home to Charlotte in September, 1989. *See* Plaintiff's Exhibit 5, Quitclaim Deed dated September 15, 1989.

Notwithstanding the Decree's mandate that he hold Charlotte harmless on the Credit Line and convey his interest in the Home to Charlotte, the Debtor obtained advances on the Credit Line subsequent to the date of the Decree which further encumbered the Home. *See* Plaintiff's Exhibit 9, pp. 2–4. The balance on the Credit Line approximated $17,627.77 on the Petition Date.

Charlotte testified that the Debtor ceased making payments on the Credit Line subsequent to the Decree. Since the Petition Date, Charlotte has been forced to make a number of interest payments on the Credit Line in order to prevent the Bank from foreclosing on the Home in which she presently resides. Charlotte has not made any principal payments on the Credit Line. Further, Charlotte testified that she is presently unable to make the current payments due on the Credit Line.

## The College Expenses

Charlotte also testified that the Debtor failed to make any of the "sustenance alimony" payments required by the Decree for his sons' college education (the "College Expenses"). *See* Decree, p. 5, para. 1. Charlotte testified that the parties set up a college fund for their children prior to their divorce (the "College Fund"). According to Charlotte, the parties agreed at the time of the divorce that, once the College Fund had been depleted, the Debtor would provide Charlotte with sufficient funds to pay for the College Expenses. Charlotte testified that the parties agreed that the College Expenses would be treated as tax deductible alimony for the Debtor.

Charlotte testified that the College Fund was depleted subsequent to the date of the Decree. Charlotte further testified that she was required to pay certain of the college expenses of her son Ted subsequent to the date of the Decree due to the Debtor's failure to comply with the terms of the Decree.

Prior to the Petition Date, in February 1993, the parties agreed to a consent judgment entry in domestic relations court whereby the Debtor agreed to pay the College Expenses at a rate of $50.00 per week until such payments were complete (the "Consent Entry"). *See* Plaintiff's Exhibit 7, Consent Judgment Entry. The Consent Entry further required the Debtor to pay Charlotte $400.00 for her attorney's fees incurred in prosecuting this action in domestic relations court (the "Attorney's Fees"). The Debtor did not make any payments in accordance with the Consent Entry.

Charlotte has calculated the amount of the College Expenses which the Debtor owes her under the Decree as $3,950.00 through the Summer of 1995.

### *DISCUSSION*

## Applicable Statute

Section 523(a) provides, in relevant part that:

[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

... (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

... (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support;

... (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523.

## Burden of Proof

■ Charlotte bears the burden of proof in this adversary proceeding by the preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## Whether the Debtor's Obligation to Assume Payments on the Credit Line Under the Decree Represents a Nondischargeable Debt

■ The Court finds that the Debtor's obligation to pay the Credit Line contained in the Decree represents a nondischargeable support obligation to Charlotte. *See Long v. Calhoun (In re Calhoun),* 715 F.2d 1103, 1107 (6th Cir.1983) ("hold[ing] that payments in the nature of support need not be made directly to the spouse or dependent to be nondischargeable").

First, the Court finds that the state divorce court and the parties intended to create a support obligation. Most importantly, the Decree contemplated that Charlotte would continue to reside in the Home. The fact that the Debtor's periodic payment of the Credit Line was necessary so that Charlotte could remain in the Home indicates that the parties intended to create a support obligation. *Leupp v. Leupp (In re Leupp),* 73 B.R. 33, 36–37 (Bankr.N.D.Ohio 1987); *see*

*In re Calhoun,* 715 F.2d at 1108 n. 7 (noting that obligations for daily necessities "indicate[ ] support"); *see also Linet v. Azia (In re Azia),* 159 B.R. 71, 74 (Bankr.D.Mass. 1993) (finding the fact that debtor's payment of second mortgage enabled former spouse to maintain shelter indicated that debtor's obligation was in the nature of support). Further, the duration of the marriage and the fact that Charlotte was charged with providing for a minor child of the marriage at the time of the Decree are consistent with Charlotte's position that the Debtor's obligation under the Credit Line represented nondischargeable support. Second, the Debtor's obligation on the Credit Line had the actual effect of providing Charlotte with necessary support. Absent the Debtor's assumption of the payments on the Credit Line, Charlotte testified that she would have been unable to meet her monthly living expenses subsequent to the date of the Decree and would have required additional support from the Debtor. *See Troup v. Troup (In re Troup),* 730 F.2d 464, 465–66 (6th Cir.1984) (held that husband's obligation to assume marital debts in exchange for wife's agreement to accept lower child support payments constituted a nondischargeable debt); *Williams v. Williams (In re Williams),* 703 F.2d 1055, 1057 (8th Cir.1983) (finding that debtor's obligation to pay marital obligations and to hold wife harmless on marital obligations was nondischargeable support where evidence indicated that debtor's obligation to pay marital obligations was intended to help spouse meet monthly living expenses); *see also Karpinski v. Karpinski (In re Karpinski),* 144 B.R. 356 (Bankr.E.D.Mich.1992) (finding the fact that nondebtor spouse was incapable of making mortgage payment on date of divorce indicative of parties' intent to create a support obligation). Third, the Debtor's obligation to repay the Credit Line cannot be characterized as "manifestly unreasonable" under traditional concepts of support. *In re Calhoun,* 715 F.2d at 1110.

## Whether the Debtor's Encumbrance of the Home Under the Open-end Mortgage Subsequent to the Date of the Decree Represented a Willful and Malicious Injury to Charlotte's Interest in the Home

■ The Court further finds that the Debtor willfully and maliciously injured

Charlotte's ownership interest in the Home when he made advances on the Credit Line subsequent to the Decree which further encumbered the Home.

Although nominally cast as an action under § 523(a)(2)(A), Charlotte's adversary to recover against the Debtor for making post-Decree advances on the Credit Line which encumbered the Home is more properly characterized as an action under § 523(a)(6). *See Grogan v. Garner,* 498 U.S. 279, 282 n. 2, 111 S.Ct. 654, 657, n. 2, 112 L.Ed.2d 755 (1991); *cf. Rubin v. West (In re Rubin),* 875 F.2d 755 (9th Cir.1989) (judgment debt arising from debtor's fraudulent representations made in debtor's purchase of residential realty held nondischargeable under § 523(a)(2)(A)). Paragraph six of Charlotte's adversary complaint adequately sets forth a cause of action under § 523(a)(6) and the facts adduced at trial supported such cause of action by the preponderance of the evidence. *See Vulcan Coals, Inc. v. Howard,* 946 F.2d 1226, 1229 (6th Cir.1991) (finding that complaint which alleged that the debtor "did a wrongful act ... intentionally which necessarily produced harm and was without cause or excuse" sufficiently stated a cause of action under § 523(a)(6)).

The Debtor's actions in encumbering Charlotte's Home with the post-Decree Mortgages were "willful". "The word 'willful' means 'deliberate or intentional,' a deliberate and intentional act which necessarily leads to injury." *Perkins v. Scharffe,* 817 F.2d 392, 394 (6th Cir.1987) (quoting 3 Collier On Bankruptcy 523–111 (15th ed. 1986)), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987). Charlotte provided evidence that the Debtor made cash advances under the Credit Line subsequent to the Decree. As the court stated in *McBee v. Brady (In re Brady),* "[a]llowing an additional mortgage to be placed on a person's home, so that the funds generated by such additional mortgage can be used for other purposes, is certain or almost certain to cause financial harm to the homeowner." *McBee v. Brady (In re Brady),* 154 B.R. 82, 85–86 (Bankr.W.D.Mo. 1993).

Moreover, the Debtor's actions in encumbering Charlotte's Home subsequent to the Decree were "malicious". " 'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm". *Wheeler v. Laudini,* 783 F.2d 610, 615 (6th Cir.1986) (citing *Tinker v. Colwell,* 193 U.S. 473, 484, 24 S.Ct. 505, 508, 48 L.Ed. 754 (1904)) (other citations omitted). Despite the fact that he had previously quitclaimed his interest in the Home to Charlotte as ordered by the Decree, the Debtor continued to take cash advances on the Credit Line and further encumbered the Home. Such actions were without just cause or excuse. *See Morsovillo v. Krause (In re Krause),* 44 B.R. 159, 162–63 (Bankr.N.D.Ill.1984) (held that debtors' purposeful execution of security agreement with the knowledge that creditor retained title in property which was the subject of security agreement represented a willful and malicious injury); *Wheel Leasing Corp. v. Markowski (In re Markowski),* 32 B.R. 85 (Bankr.S.D.Fla.1983) (debtors' actions in executing note and mortgage on boat subsequent to the debtors' conveyance of all of debtor's interest in boat to another party constituted willful and malicious injury); *see also Peabey Associates, ACP v. Haisfield (In re Haisfield Enterprises of Florida),* 154 B.R. 803 (Bankr.S.D.Fla.1993) (finding that state court judgment against debtor for wrongful filing of lis pendens against creditor's property represented a willful and malicious injury); *Mumm v. Adametz (In re Adametz),* 53 B.R. 299 (Bankr. W.D.Wisc.1985) (debtor/bailee's actions in trading farm equipment without consent of bailor or secured creditor constituted a willful and malicious injury); *cf. Grynevich v. Grynevich (In re Grynevich),* 172 B.R. 888 (Bankr.N.D.Ill.1994) (debtor's knowing failure to make court ordered mortgage and utility payments on former marital home held to constitute a willful and malicious injury to former spouse's interest in home); *Blackwood v. Rushing (In re Rushing),* 161 B.R. 984 (Bankr.E.D.Ark.1993) (debtor's actions in obstructing sale of real estate which sale had been ordered by divorce court held to be a willful and malicious injury).

Significantly, the Debtor did not provide any evidence to indicate that he did

not understand the terms of the Credit Line or the Open-end Mortgage at the time when these documents were executed. Nor did he present any evidence that he failed to understand the terms of the Credit Line or the Open-end Mortgage subsequent to the date of Decree. In this connection, the Court notes that judicial notice of the hearsay assertion contained in the Debtor's bankruptcy schedules that he "believed [the Credit Line] to be a Signature loan" is not permitted under the Federal Rules of Evidence. Fed. R.Evid. 201(b)(2). As this Court has previously noted, the actual truth of the assertions contained in a Debtor's bankruptcy schedules cannot readily be ascertained and such assertions are not the proper subject of judicial notice. *See French v. Diller (In re Stauffer),* unpublished, 1994 WL 115914 at *2–3 (Bankr.N.D.Ohio 1994) (citing cases).

**Whether the Debtor's Obligation to Reimburse Charlotte for the College Expenses Under the Decree Represents a Nondischargeable Debt**

■ The Court finds that the Debtor's obligation to reimburse Charlotte for the College Expenses represents a nondischargeable support obligation.

First, the Decree specifically characterized the Debtor's obligation to pay Charlotte for the College Expenses as "sustenance alimony".

Second, the Court finds that the parties and the state domestic relations court intended to create a support obligation. In view of the specific language of the Decree and the length of the marriage, the Court finds that the parties and the state domestic relations court intended to create a support obligation. *See In re Calhoun,* 715 F.2d at 1108 n. 7 (listing factors which indicate whether parties and state court intended a support obligation). Furthermore, Charlotte's testimony that the parties intended that the Debtor would deduct the College Expenses as alimony on his income tax returns also supports the conclusion that the College Expenses represent nondischargeable support. *Cf. Robb–Fulton v. Robb (In re Robb),* 23 F.3d 895, 898–99 (4th Cir.1994) (held that debtor who deducted payments to former wife as

alimony on his federal income tax returns was estopped from claiming that debt to wife was dischargeable in bankruptcy).

■ Here, as in *Fitzgerald v. Fitzgerald (In re Fitzgerald),* where an obligation is specifically denominated as alimony and the obligation was intended to serve as alimony "Congress has directed that [such obligation is] not dischargeable". *Fitzgerald v. Fitzgerald (In re Fitzgerald),* 9 F.3d 517, 521 (6th Cir.1993).

■ Contrary to the Debtor's argument at trial, the fact that the parties entered into the Consent Entry does not alter the nature of the debt which the Debtor owes to Charlotte for the College Expenses. *See Castle v. Parrish (In re Parrish),* 29 B.R. 869 (Bankr. S.D.Ohio 1983) (finding that the nondischargeable nature of child support judgment in divorce decree was not altered by subsequent lump sum judgment); *cf. Avery v. Avery (In re Avery),* 114 F.2d 768, 769 (6th Cir.1940) (finding that the fact divorce decree was subsequently reduced to judgment did not change the nature of the debt). Indeed, the Consent Entry specifically refers to the Debtor's obligation to Charlotte for the College Expenses as "sustenance alimony".

**Whether the Debtor's Obligation for the Attorney's Fees Represents a Nondischargeable Debt**

■ In consideration of the facts presented at trial, the Court further finds that the Debtor's obligation to pay the Attorney's Fees incurred in Charlotte's efforts to collect the College Expenses represents a nondischargeable support obligation. *See Portaro v. Portaro (In re Portaro),* 108 B.R. 142, 146 (Bankr.N.D.Ohio 1989) (finding that attorneys fees awarded by state court which reflected an "intention to prevent economic harm to [the ex-spouse] during the divorce litigation" represented nondischargeable support); *see also Kahoe v. Williams (In re Williams),* 151 B.R. 605, 607 (Bankr. M.D.Fla.1993) (held that ex-spouse's attorney's fees incurred in prosecuting motion for nonpayment of support against debtor represented nondischargeable support); *cf. Jones v. Jones (In re Jones),* 9 F.3d 878, 881 (10th

Cir.1993) (finding that court awarded attorney fees arising in post-divorce custody proceeding represented nondischargeable child support); *Pauley v. Spong (In re Spong),* 661 F.2d 6, 9 (2nd Cir.1981) (stating that "[a]n award of attorney's fees may be essential to a spouse's ability to sue or defend a matrimonial action" and therefore a necessity).

█ Here, as in *Pinkstaff v. Pinkstaff (In re Pinkstaff),* the Court notes that the "present needs" test articulated in *Calhoun* is inapposite to the determination of whether a support arrearage, such as the Attorney's Fees, should be excepted from discharge. *Pinkstaff v. Pinkstaff (In re Pinkstaff),* 163 B.R. 504, 508 (Bankr.N.D.Ohio 1994) (citations omitted); *see also In re Fitzgerald,* 9 F.3d at 520 ("f[inding] no case in which a court discharged past-due obligations that were intended as support by the state court or the parties").

In light of the foregoing, it is therefore

ORDERED that the Debtor's obligations to Charlotte for the Credit Line, the College Expenses and the Attorney's Fees be, and they hereby are, excepted from discharge.